**John L. MOTTA, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–5037.

Court of Appeals of Alaska.

Feb. 9, 1996.

---

Paul E. Malin, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

John L. Motta was convicted, following a jury trial, of murder in the first degree. AS 11.41.100(a)(1)(A). Superior Court Judge Milton M. Souter sentenced Motta to a maximum term of ninety-nine years and specified that Motta was ineligible for parole. Motta appeals his conviction, contending that the superior court erred in failing to suppress a confession that Motta made to the police without being advised of his Miranda[1] rights. Motta also challenges his sentence as excessive. We conclude that the superior court erred in failing to suppress Motta's confession. Because we find the current briefing on harmless error inadequate, we retain jurisdiction and order additional briefing on the issue.

During 1992, Motta, Margaret "Peggy" Skauen, and Skauen's eleven-year-old son lived together in Skauen's mobile home in Anchorage. Between April 25 and 27 of that year, Skauen disappeared. On May 28, 1992, Hal Gunn, whose wife Tina Gunn worked for Skauen, called the police to report that Skauen was missing and that the Gunns suspected foul play by Motta.

The next day, Skauen's sister, Suzanne Nordahl, called the Anchorage police from her home in Oregon and reported that Skauen had been missing for about five weeks. Nordahl further reported that she had spoken to Motta about her sister's disappearance and that Motta had said that Skauen was on a "drunken vacation" in Washington state. According to Nordahl, Motta also said that he had received several calls from Skauen. Nordahl added that Motta had assured her that Skauen would return to Anchorage on May 28; Nordahl decided to call the police when her sister failed to return on that date.

After calling the police from her Oregon home, Nordahl flew to Anchorage. Early in the morning on May 30, she showed up unannounced at Skauen's trailer and confronted Motta. Motta apologized for the trailer's odor, which Nordahl had not noticed; he claimed that Skauen's dogs had "pottied" in the house. Nordahl took her nephew with her when she left. Several days later, Nordahl returned to pick up her nephew's belongings. She found that the trailer had been cleaned up and that it smelled strongly of pine-scented cleaner. Motta told Nordahl that he was trying to get rid of the "doggie smell" in the house.

In response to the reports of Skauen's disappearance, the police began an investigation. The police learned that Motta was on parole for burglary, robbery and theft. Anchorage Police Detective Tom Johnson interviewed various acquaintances of Skauen and Motta and learned of several inconsistencies in Motta's explanation for Skauen's absence. Johnson also learned that, before disappearing, Skauen complained to Tina Gunn of past

1. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

fights between Motta and Skauen in which Motta had tried to choke Skauen.

On June 4, 1992, Johnson and Detective Richard Mills went to Skauen's trailer to speak with Motta. The detectives wore plain clothes and drove an unmarked police car. When Motta answered the door, both detectives noticed the strong smell of pine-scented cleaner. The detectives identified themselves, informed Motta that they were investigating Skauen's disappearance, and asked if Motta would agree to an interview at the police station. Motta agreed, telling the detectives that he would help in any way that he could. After arranging to meet Motta at the station, the detectives left.

Approximately forty minutes later, Motta arrived at the station in his own car. Johnson and Mills conducted Motta to a small interview room; after entering with Motta, they closed the door. Johnson expressly advised Motta that he was not under arrest and assured him that the police would not arrest him at the conclusion of the interview. Johnson explained that the door to the interview room was closed for privacy and that Motta was free to leave at any time. During the ensuing interview, Motta repeated the story that he had told others about Skauen being on vacation in Washington, including the claim that Skauen had called him from Seattle several times during her absence. When the interview ended, Motta left on his own.

The next day, June 5, the police obtained telephone records showing that no long-distance calls had been made to Skauen's trailer during the period of her absence. A subsequent investigation of local airlines showed no evidence that Peggy Skauen had flown to Seattle from Anchorage between April 25 and 27, 1992.

On the morning of June 12, the police obtained a search warrant for Skauen's mobile home. At 11:30 a.m., Detective Johnson and Detective Greg Baker drove to the trailer in an unmarked police car. Both detectives wore plain clothes and carried no visible weapons. When the detectives arrived at the door, Motta answered. Johnson introduced Baker and told Motta that the police were still investigating Skauen's disappearance.

He asked if Motta would be willing to come to the station again for another interview. Motta agreed, and the detectives left. Motta was not told that the police had a warrant to search Skauen's trailer or that Motta was a suspect in Skauen's disappearance.

Motta arrived at the police station in his own car just after noon. Johnson met Motta in the front lobby and escorted him back to the investigation area. Baker joined them and they proceeded to the room where Motta had been interviewed a week earlier. The detectives did not search or restrain Motta, nor did they advise him of his *Miranda* rights. As in the first interview, the door to the interview room was closed. Johnson told Motta, "I don't want you to think that you're trapped or forced to be here. Uh, you ..." Motta interrupted, saying, "No. I want to." Before commencing the interview, Johnson again reminded Motta:

> I just want you ta—to think or even get the remotest opinion or feeling that you're being forced to make this statement, okay? And I want the statement that you're gonna give us, want it to be voluntary, and I don't want you to feel like you're being trapped here. The door is closed for our privacy, and that's the only reason it's closed. You understand that, John?

Motta answered, "Sure."

Detective Baker then told Motta that the police needed to search the trailer. Baker asked if Motta had any problem with that; Motta replied "No." Motta was handed a waiver form to consent to the search of the trailer and his vehicles. Baker told Motta that he did not have to consent to the search. Motta signed the form, gave the detectives a set of keys, and volunteered information about which keys fit which locks and what locks should already be open.

The detectives began to interview Motta at 12:14 p.m. Shortly after the interview began, Baker and Johnson learned that a body had been found at Skauen's trailer. They decided to continue the interview in a nonaccusatory manner, since the victim's identity had not yet been confirmed. During the ensuing two hours and forty-five minutes, Motta maintained the story that he had pre-

viously told. At one point, when the detectives asked Motta if he had any relationships "on the side," Motta refused to answer, telling them that it was none of their business. The detectives did not pursue the issue.

After some time, Baker and Johnson began to confront Motta with inconsistencies in his story. Baker told Motta, "AT & T tells us that there have been no long-distance calls placed to your home ... from the Washington, Seattle area, at all[.]" Motta continued to affirm his original story. At around 3:00 p.m., the detectives left Motta alone in the interrogation room for several minutes. They instructed him to "just sit tight, relax."

While Motta waited, the detectives learned that the body at the trailer had been identified as Skauen's. Officers executing the warrant had found Skauen's badly decomposed body in the crawl space beneath the trailer. Skauen's ankles and hands had been tied behind her back in a complex series of knots; she had been gagged with a pair of socks. Her body had been wrapped in plastic and covered with a sleeping bag. The area around body had been soaked with pine-scented cleaning fluid to conceal the odor of Skauen's remains. An autopsy later revealed that Skauen had been struck three times on the head with a blunt object and then strangled with ropes that had been tied around her neck.

Baker and Johnson rejoined Motta shortly after 3:00 p.m. The tone of the interrogation became accusatory at that point. Baker began by asking Motta about the crawl space under the trailer. He told Motta that the officers searching the house had noticed the odor of disinfectant. At about 3:07 p.m., the detectives again confronted Motta with the fact that the telephone records did not support his story, and added that airline records also failed to show that Skauen had left the state. Motta continued to insist that he had been truthful, but Baker told him that the search team had found Skauen's body.

Johnson then suggested that whatever happened to Skauen must have been a "dumb mistake" and that there had to be a reasonable explanation for it. Baker urged Motta to explain what had happened, telling him, "it's not gonna go away, we've got to deal with it. ... There's no way to cover it up anymore." Baker and Johnson offered Motta excuses for the killing, suggesting that it might have been accidental or unintentional. Johnson emphasized "You can't—can't, eh, deny it. There's no way to cover it up anymore, it's out in the open." Baker added: "There's no alternative now."

At that point, Motta asked if he could get a pack of cigarettes from his car. Johnson offered him cigarettes, but Motta said that he wanted his own. Motta began to ask, "Can I go ..." But Johnson interrupted, saying that he would send somebody out to get them. Motta thanked Johnson and told him where the cigarettes were. Johnson then left the room. In Johnson's absence, Baker continued to press Motta for information, insisting that Motta tell him the truth. In a short while, at 3:23 p.m., Motta confessed to killing Skauen and hiding her body under the trailer. Motta claimed, however, that he had acted in self-defense.

According to Motta, on the night of the killing, Skauen came home drunk and attacked him in his sleep, yelling at him and berating him for not accompanying her to the bar. Motta said he responded to the attack by striking Skauen on the head with a metal ashtray; Skauen continued to yell and struggle, so Motta stuffed socks in her mouth to silence her. As the situation escalated, he tied her arms and hands with rope, and then tied ropes around her neck, ultimately choking her to death.

Following this confession, Baker told Motta that he had done the right thing by confessing. Baker also said that Motta was not under arrest and was free to leave at any time. Motta appeared surprised by this statement, but Baker reminded him of the earlier statement that he did not have to stay and answer questions. Obviously pleased at learning that he was free to go, Motta remained at the station for a while longer, chatting with the detectives and answering several additional questions. Then, sometime between 4:30 and 5:00 p.m., after having his picture and fingerprints taken, Motta left the station.

Motta had been told that the police were not finished with his car, so, upon leaving the station, he walked to a nearby shopping mall. The police maintained constant surveillance over Motta as Detective Johnson obtained an arrest warrant. About two hours after Motta left the station, the police arrested him.

After being indicted for first-degree murder, Motta moved to suppress his confession, arguing that his June 12 interrogation had been custodial and that he should therefore have been advised of his *Miranda* rights. Upon reviewing the videotape, audiotape, and transcript of Motta's June 12 interrogation, Judge Souter denied the motion, finding that Motta had voluntarily gone to the police station and that the detectives had informed him that he was free to leave at any time. Judge Souter concluded that a reasonable person in Motta's position "would have believed that he was free to stop the inquiry at any point and to leave, and that he was not in custody." For this reason, the judge ruled that a *Miranda* warning had not been necessary.

The state subsequently introduced Motta's confession against him at trial. Motta took the stand in his own defense, advancing a mixed claim of self-defense and heat of passion. Motta's description of the incident at trial was generally compatible with the account that he had given the police in his confession. The jury rejected the defense and convicted Motta of first-degree murder. On appeal, Motta argues that the superior court erred in ruling that his June 12 interrogation was non-custodial.

■ Under *Miranda v. Arizona,* 384 U.S. at 443–44, 86 S.Ct. at 1611–12, Motta was entitled to be advised of his Fifth and Sixth Amendment rights before being subjected to custodial interrogation. "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612. Only a restraint of a "degree associated with formal arrest" will constitute *Miranda* custody, however. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983).

■ The test of *Miranda* custody is an objective one: a person is in custody when the police say or do something "such that a reasonable person would feel he was not free to leave and break off police questioning." *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979). The determination of *Miranda* custody depends on the totality of the circumstances:

At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendants said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.

*Hunter,* 590 P.2d at 895 (footnotes omitted).

Federal courts have found certain factors particularly significant on the issue of *Miranda* custody, including:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official request to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect

was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir.1990). To a lesser extent, the purpose, place, and length of the interrogation have also been deemed potentially significant. Id. at 1348–49. We have recently emphasized that an interrogation that is noncustodial at its inception may become custodial as it progresses. Haas v. State, 897 P.2d 1333, 1336 (Alaska App.1995).

■ Applying these principles to the present case, we conclude that Judge Souter properly found Motta's June 12 interrogation non-custodial at its inception. Motta drove his own truck, unescorted, to the police station. At the beginning of the interview, Detective Johnson reminded Motta that he had come to the police station voluntarily and that the only reason the door to the interview room was closed was for privacy. Motta had every reason to accept these assurances at face value: he had been interviewed in the same room eight days previously and had been released at the conclusion of the interrogation.

The early portion of the interview was conducted in a relaxed and non-confrontational manner. Toward the latter part of the interrogation, however, after the police confirmed that the body found in the crawl space was Skauen's, the character of the interrogation plainly became confrontational. The recent discoveries were disclosed to Motta, and Motta was confronted with evidence indicating the falsity of his version of events. The police made it clear to Motta that he was a prime suspect and that they had abundant evidence against him. Cf. State v. Murray, 796 P.2d 849, 851–52 n. 1 (Alaska App.1990) (defendant's status as focus of police suspicion relevant for Miranda purposes only to the extent that police took objective action to make status clear to defendant in a manner suggesting likelihood of custody). Motta's status as a parolee was brought to the fore and discussed. Motta was told in no uncertain terms that he had "to deal with it," that "you can't ... deny it," and that there remained "no alternative now."

By this point, Motta had been under interrogation for three hours. Although he had been told at the outset of the interrogation that he was there voluntarily and that the door to the interview room was closed only for privacy, he had not been explicitly told, as he had been prior to the June 4 interview, that he was not under arrest; more significant still, he had not been assured, as he had been before the prior interview, that he would not be placed under arrest when the interrogation concluded. On several occasions when Motta visited the restroom during the interrogation, he was accompanied by an officer. During all other breaks in the interrogation, Motta was asked to stay in the interrogation room. Between the opening minutes of the interrogation and the parting questions following Motta's confession, Motta was never reminded that he was not under arrest or told that he was free to leave.

Hence, by the time the interview became openly confrontational, Motta's situation was, from an objective standpoint, equivocal at best. The last straw tipping the scale toward custody came when Motta attempted to retrieve his cigarettes from his car. Motta was firmly steered away from leaving the room. Detective Johnson went for the cigarettes instead, while Baker remained with Motta and continued to press the interrogation. At this juncture, a reasonable person in Motta's shoes would no longer have felt free to break off questioning and leave. Given the totality of the circumstances, Motta's apparent shock a short time later at being told that he was still free to go hardly seems surprising. To the contrary, it is a reaction that could have been expected from virtually any reasonable person in Motta's shoes.

In short, we conclude that Motta's interrogation of June 12 had clearly become confrontational by the time he confessed to the police. Accordingly, Motta should have been apprised of his Miranda rights. Because he was not so advised, the superior court erred in denying Motta's motion to suppress evidence.

■ We must next consider whether this error was harmless. Arizona v. Fulminante, 499 U.S. 279, 306–12, 111 S.Ct. 1246, 1262–66, 113 L.Ed.2d 302 (1991). Because the error is of constitutional dimension, the

pertinent inquiry is whether it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The parties' briefing on this point is conclusory and unilluminating. The state contends that evidence of Motta's guilt was overwhelming, even apart from his confession. The state thus maintains that the confession was "unimportant in relation to everything else the jury considered on the issue." *Yates v. Evatt,* 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991). Motta counters by citing *Collazo v. Estelle,* 940 F.2d 411, 424 (9th Cir.1991) (en banc) (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 1629–30, 20 L.Ed.2d 476 (1968)), *cert. denied,* 502 U.S. 1031, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992), to the effect that "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted.... Certainly, confessions have profound impact on the jury[.]'" Motta insists that the confession cannot be dismissed as "unimportant."

Were this a case in which the confession was the only detailed account of the offense to come from Motta, we would be inclined to agree with Motta that the error could not readily be dismissed as harmless beyond a reasonable doubt. For the state's harmless error argument "ignores the qualitative impact of allowing the jury to hear in [Motta's] own words" how he committed the offense. *United States v. Harrison,* 34 F.3d 886, 892 (9th Cir.1994). Even in the face of powerful independent proof of guilt, the defendant's inculpatory description of the offense "may tempt the jury to rely upon that evidence alone in reaching its decision." *Fulminante,* 499 U.S. at 296, 111 S.Ct. at 1258.

Yet in the present case, the tainted confession was hardly the only detailed account from Motta's own mouth. As we have al-

ready observed, Motta took the stand in his own defense at trial and presented a version of events that in large measure paralleled his tainted confession.

Motta's harmless error argument suggests—without expressly asserting—that, but for the trial court's error in denying his motion to suppress, Motta might not have taken the stand in his own defense. *Cf. People v. Boyer,* 48 Cal.3d 247, 256 Cal.Rptr. 96, 768 P.2d 610, 628 (1989) (for purposes of determining harmless error, court cannot assume that defendant would have testified and conceded identity had extra-judicial statement been excluded). As a practical matter, this suggestion seems implausible.[2] An even greater problem with the suggestion, however, is that Motta should arguably be precluded as a matter of law from asserting that he would have elected not to testify if his confession had been suppressed.

In *State v. Wickham,* 796 P.2d 1354 (Alaska 1990), for example, the superior court ruled that Wickham's testimony would be subject to impeachment by prior conviction pursuant to Evidence Rule 609 if Wickham testified at trial. Wickham opted not to testify. *Id.* at 1355. Despite Wickham's express offer of proof at trial that he would have testified but for the superior court's ruling, the Alaska Supreme Court concluded that Wickham's failure to take the stand barred him from arguing on appeal that the trial court erred in ruling that he could be impeached if he testified. *Id.* at 1355, 1358.

The present case, in our view, presents essentially the converse of the *Wickham* situation. Motta voluntarily elected to testify in his own defense at trial. By taking the stand and providing the jury with what appears to have been essentially a live version of his earlier confession, he arguably rendered harmless any error in failing to suppress his

---

2. We must recall that Motta gave numerous obviously false exculpatory statements prior to confessing the offense. All would have been admissible against him, despite the *Miranda* violation. In the face of these statements, it hardly seems plausible that Motta would have chosen to refrain from presenting to the jury his self-defense/heat of passion theory if his motion to suppress the improper confession had been sus-

tained. Indeed, it might be argued that, as a practical matter, Motta might have been sorely tempted to rely on the improper confession, even had his motion to suppress been granted. For with evidence of Motta's false exculpatory accounts and absent knowledge of his confession, Motta's trial testimony would have appeared to the jury to be a recent fabrication.

confession. Motta's trial testimony is so attenuated from the initial illegality that it cannot be regarded as a fruit of the poisonous tree. And Motta was certainly under no compulsion to testify in his own defense. Under these circumstances, because Motta opted to repeat from the witness stand his earlier confession, it is far from obvious that our harmless error analysis should be governed by speculation that Motta might have opted otherwise had his confession been suppressed.

Neither party addresses this issue in the briefs. And as we have already indicated, both parties' treatment of the harmless error issue is cursory. Accordingly, we find it necessary to remand this case for supplemental briefing on the issue of harmless error. In addressing the harmless error issue in their supplemental briefs, the parties are directed to discuss whether our harmless error analysis should take into account the possibility that Motta might not have testified, or might have testified differently, if the superior court had not erred in denying his suppression motion. The parties are also directed to discuss, assuming that speculation about Motta's testimony is not germane, whether the tainted confession amounted to harmless error given Motta's essentially duplicative trial testimony.[3]

We therefore DIRECT the parties to file supplemental briefs addressing these harmless error issues.[4]

---

3. We do not preclude the parties, to the extent they deem it appropriate, from also presenting more detailed argument on whether Motta's confession should be deemed harmless even if we assume that he might not have testified, or might have testified differently, had the superior court suppressed the confession.

4. We retain jurisdiction over this case and reserve decision on Motta's sentencing issues pending completion of the supplemental briefs. Motta's opening supplemental brief shall be filed within thirty days of the date of issuance of this decision; the state's response shall be due thirty days after Motta files his opening supplemental brief. Motta may file a reply brief fifteen days after the state's brief is filed. Either party may request oral argument within the time specified in Appellate Rule 213.