**Reginald R. JONES, Jr., Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. A–7826.**

Court of Appeals of Alaska.

March 14, 2003.

---

**11.** *State v. Chaney,* 477 P.2d 441, 443–44 (Alaska 1970).

**12.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

Dan S. Bair, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Petitioner.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

During his custodial interrogation, Reginald R. Jones, Jr., asked his interrogator several times if they could speak "off the record." The officer agreed that Jones could speak "off the record, between you and me." The conversation was actually recorded and Jones made several damaging admissions. After the grand jury indicted him, Jones moved to suppress the "off the record" statements. The superior court denied Jones's motion and much of Jones's statement was admitted at trial.

Based on our independent evaluation of the record, we conclude that Jones's statement was involuntary. Because the admission of Jones's involuntary statement was not harmless error, we reverse the superior court.

### Background facts

Jones and two other males were charged with sexually penetrating E.C., a fourteen-year-old female, on April 18, 1998, without her consent. On July 20, 1998, the Anchorage police arrested Jones for two counts of first-degree sexual assault and two counts of second-degree sexual abuse of a minor.[1] Detective Harold Strahle questioned Jones when Jones was in custody at the police station in an interview room. Strahle started the interview by advising Jones of his *Miranda* rights.[2] Jones said he understood his rights and agreed to talk with Strahle. Jones also signed a form waiving his rights.

At first, only Strahle questioned Jones. During this first part, Jones admitted that he attended a party at the victim's home, but claimed that he was very drunk and could not remember everything that happened there. However, Jones denied any wrongdoing, and specifically denied any intercourse with E.C. Jones remarked that he could not "snitch" or "tell on anyone."

Strahle suggested a number of times that the interview was Jones's chance to tell his story; Jones commented several times that he had to see something in writing before he would talk. Jones also asked whether there was any way he could "beat this" or "get around this." Strahle said that he could not promise Jones anything and advised Jones that he could not drop any charges. Jones stated several times that he was going to jail for this no matter what, "more'n likely, cause I'm black, I'm young . . . ."

Detective Alvin Kennedy, an African American police officer, joined the interview. Both Kennedy and Strahle continued questioning Jones but Jones continued to deny sexual assault or any sexual contact with the victim. Kennedy encouraged Jones to look out for himself, and told him that he knew the other suspects and that they would do the same. The officers explained how aggravators and mitigators work during sentencing[3] and talked about how unfounded charges would be dropped. They told Jones they did not think he was a "bad guy," that they did not believe he initiated the assault, and that he might be as much a victim as E.C. They mentioned Jones's own children, and asked Jones how he would feel if his daughter was assaulted.

Jones said he thought the officers were trying to trick him, that whatever he did would not make any difference, that none of the charges would be dropped, that he was going to jail for 20 years, and again he declined to implicate the other suspects. However, Jones offered to say something if the detectives could tell him that some

1. AS 11.41.410(a)(1) & AS 11.41.436(a)(1) respectively.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. *See* AS 12.55.155.

charges would be dropped. Again, the detectives refused to make any promise. During this part of the interview, Jones requested and was granted some time alone. The detectives offered him coffee or a soft drink, but Jones declined.

Strahle announced he was leaving to interview the other suspects and said specifically that he was taking "the tape recorder and stuff." Strahle told Kennedy he could continue to talk with Jones to "see if he wants to decide to change his mind or not."

After Strahle left, Kennedy asked Jones whether or not he had tried to help E.C. Jones said that he was scared, that "Dew" (Jones's co-defendant Kevick Pruitt, also called "K") had a gun, that he had pointed the gun at Jones before, and that "K" told him to "hurry up" and "start doin' something." Jones claimed that he thought "K" might hit him with the gun, and that he had told E.C. that he was scared too. Jones alleged that "K" told him to "get in behind."

At this point, the following exchange occurred:

*Jones:* This is off the record, right?

*Kennedy:* You and I . . . there's no tape recorder.

*Jones:* Seriously _____ officer . . .

*Kennedy:* This is 'tween you and I, and everybody know what I say is 'tween you and I what that means. You ask around about me. When I say it's between you and I, it's between you and I.

*Jones:* This is off the record?

*Kennedy:* Off the record between you and I.

*Jones:* Yeah . . . I know y'all got about 15 mikes in here . . . tryin' to get nobody in trouble . . . I gotta get this off my chest man . . . cause I been holdin' it in man . . . the only person I told's my girl . . . Dude, every time I kickin' with him I get in trouble.

After this, Jones discussed some of the events without any significant detail about his alleged misconduct. Kennedy left the interview room momentarily and when he returned, Jones asked who else the police were interviewing. He told Kennedy one person who was not involved. Kennedy then asked about one of Jones's co-defendants whose nickname was "Short":

*Kennedy:* . . . What about Short?

*Jones:* Is this still off the record?

*Kennedy:* You and I talking . . . I'm trying to get you to realize how important this is for you.

*Jones:* I don't know man.

*Kennedy:* And see the way you're sitting here . . . just you and I conversin' back and forth . . . he [Detective Strahle] can come in here and turn that tape recorder on and you can converse with him the same way . . . but you gotta be comfortable what you're doin'? OK. . . .

After this, Jones admitted he had sex with E.C.: ". . . I'm gonna say this . . . I mean I did have sex with her but I . . . I ain't even . . . I ain't even _____ havin' sex or whatever, I don't know . . . all I know is she kept sayin' she wanted to do with me, only." Jones next said that both he and Kevick had sex with the victim. Kennedy sought details:

*Kennedy:* What'd he do to her?

*Jones:* I don't know.

*Kennedy:* You know what happened . . . what'd he do to her?

*Jones:* What'j you mean?

*Kennedy:* What'd he . . . what'd he do?

*Jones:* Just . . . nn . . . is this off the . . . _____ got a . . . got a tape recorder in there . . .

*Kennedy:* No, it ain't no tape recorder . . .

*Jones:* A video camera . . .

*Kennedy:* Video camera, whatever, just me and you talkin' man . . . gotta have a tape in the thing for it to record . . .

*Jones:* The lights on . . .

*Kennedy:* Lights always on . . . secretaries work back there, that's who you keep hearing going in and out that door . . . that's where all the typing's done at.

Jones then described the various acts of sexual penetration performed by himself and his two co-defendants. He also admitted that he knew E.C. was fourteen years old, but maintained that E.C. wanted to have sex with him but not the others.

After Jones finished with the story, Kennedy suggested he tell it to Strahle. Jones replied, "Yeah, I think I might as well ..." When Strahle came back into the room and Kennedy left, Strahle continued the ruse that what Jones told Kennedy had been confidential. They discussed the possibility that the assault charges could be dismissed, and Strahle told Jones that only the district attorney changes charges. Jones offered to tell his story to the district attorney directly, and asked Strahle if they were speaking "on record." Strahle verified that they were on the record, and assured Jones that it was not necessary to wait and tell the district attorney.

Strahle said that he did not know what Jones had told Kennedy, but that, "I'm gonna find out ... and ... y'know if I have to bring [Kennedy] into court and say ... this is what he told me, I will, and I don't want to...." Jones responded, "But he can't do that because it's off the record ... officer I know that one."

Jones asked Strahle if he could tell him his story, and Strahle said, "Yeah ... you gonna let me turn the tape recorder on, we'll go through it." Jones agreed, and Strahle re-advised him of his rights. However, Jones invoked his right to counsel.

The grand jury returned an indictment that charged Jones with two counts of first-degree sexual assault and two counts of second-degree sexual abuse of a minor. Jones moved to suppress his statement. Superior Court Judge Larry D. Card suppressed all that occurred after Jones invoked his right to counsel. Judge Card found that Jones had prior experience with the police and had been previously convicted of an offense. He found that the questioning was relaxed, that Jones did not suffer any physical deprivation or mistreatment, that he was treated very well at all times, and was allowed time to relax

and be alone upon request. Judge Card also found that no threats were made against Jones, and that no inducements were offered. Although the police deceived Jones by recording his statement, Judge Card ruled that the statement the police said was "off the record" was nonetheless voluntary. At trial, the State offered a redacted transcript of Jones's statement and it was admitted. The jury convicted Jones on all counts. This appeal followed.

*Was Jones's statement involuntary?*

■ The Alaska Supreme Court has adopted a totality of the circumstances test to analyze whether a statement is voluntary.[4] This analysis presents a mixed question of law and fact.[5] First, a court must find the external, historical facts surrounding the confession. Second, the court must infer the defendant's mental state from the external, historical facts. Third, the court must assess the legal significance of the inferred mental state.[6] The first step in this analysis depends on the trial judge's fact-finding; we uphold those findings unless the findings are clearly erroneous.[7] The last two steps in the analysis require us to evaluate the record independently and form our own conclusion, based on the totality of the circumstances, about the defendant's inferred mental state and its legal significance.[8] Among the circumstances to consider are "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[9]

In *Webb v. State*,[10] the supreme court recognized that "certain improper conduct is so coercive as to render a *Miranda* waiver involuntary without regard to the totality of circumstances."[11] The police stopped Webb

---

**4.** See *Stobaugh v. State*, 614 P.2d 767, 772 (Alaska 1980).

**5.** See *State v. Ridgely*, 732 P.2d 550, 554 (Alaska 1987).

**6.** *Id.*

**7.** *Id.*

**8.** *Id.*

**9.** *Sprague v. State*, 590 P.2d 410, 414 (Alaska 1979) (quoting *Brown v. United States*, 356 F.2d 230, 232 (10th Cir.1966)).

**10.** 756 P.2d 293 (Alaska 1988).

**11.** *Id.* at 297.

soon after he picked up a package at a delivery service.[12] A police officer took Webb's driver's license and told him that it would be returned to him only if he "followed [the troopers] back up to their office and made a statement."[13] Webb followed the troopers to the office where he provided an inculpatory statement.[14] The supreme court noted that Webb was presented with the choice of exercising his right to remain silent and losing a valuable property interest, his driver's license, or making an incriminating statement to secure his license.[15] The court ruled that conditioning the exercise of the right to remain silent against the loss of another constitutionally protected interest was involuntary per se.[16]

In *Beavers v. State*,[17] the police were investigating a series of robberies and were interviewing sixteen-year-old Beavers in a patrol car parked outside his place of employment.[18] Beavers was not under arrest and was told that he could leave at any time.[19] The Alaska Supreme Court held that a police officer's warning to the suspect that if he tried to hide the truth about the robberies, he would be "hammered," rendered the suspect's following inculpatory statements presumptively involuntary in the absence of affirmative evidence that the suspect's will was not overborne.[20]

However, not all improper conduct triggers the per se rule or the presumption that a statement is involuntary. For example, in *Sovalik v. State*,[21] the Alaska Supreme Court ruled that Sovalik's inculpatory statement was voluntary even though a police officer deceived Sovalik by falsely claiming that the police had physical evidence implicating Sovalik in a double homicide.[22] The court ruled that the officer's deceit about the evidence was merely one factor to consider in the totality of the circumstances.[23]

But courts analyzing an officer's deceit concerning the legal significance of a defendant's inculpatory statement have been more restrictive. In *State v. McDermott*,[24] the New Hampshire Supreme Court held a statement involuntary when it was obtained after a promise that the information provided "would not leave the office."[25] The court explained that this type of promise is to be distinguished from other promises frequently made by law enforcement:

> A confession made in reliance upon a promise of confidentiality or a promise of immunity is involuntary and coerced[.]
> ... Promises to inform other authorities of the defendant's cooperation, or to recommend reduced bail in exchange for incriminating evidence, which promises are not dispositive of the issue of voluntariness but add to the State's burden of proof, are categorically different from a promise of confidentiality or of immunity from prosecution in exchange for a statement or confession.[26]

The court concluded that a promise of confidentiality, not honored by the government, violates due process under New Hampshire law, and therefore must be excluded.[27]

In *United States v. Conley*,[28] a federal agent engaged in a series of conversations

12. *Id.* at 294.

13. *Id.* at 295.

14. *Id.*

15. *Id.* at 297.

16. *Id.*

17. 998 P.2d 1040 (Alaska 2000).

18. *Id.* at 1041.

19. *Id.* at 1042.

20. *Id.* at 1048.

21. 612 P.2d 1003 (Alaska 1980).

22. *Id.* at 1007.

23. *Id.* at 1007 n. 4.

24. 131 N.H. 495, 554 A.2d 1302 (1989).

25. *Id.* at 1304, 1306 (basing decision on New Hampshire's state constitution).

26. *Id.* at 1305–06 (citing *inter alia State v. Nash*, 228 Neb. 69, 421 N.W.2d 41, 43–44 (Neb.1988) (statement that reasonably could be interpreted as a promise of confidentiality would prevent finding that statement was voluntary)).

27. *Id.*

28. 859 F.Supp. 830 (W.D.Penn.1994).

with the defendant in order to get information about others involved in illegal activity.[29] At the start of these meetings, the agent assured the defendant that their conversation was "off the record," but after the defendant admitted he broke the law, the agents arrested the defendant and his statements were offered at trial.[30] The court found these statements to be involuntary:

> A promise by a law-enforcement officer may qualify, under the circumstances, as coercion. In particular, where an express or implied promise not to use statements against, or not to prosecute, a declarant is made, is not contingent or qualified, and in fact induces the statement, the promise is of such a nature that it can easily be found to have overcome a person's resistance to giving a statement to authorities.... A promise that statements made will not be used against the declarant purports to remove the specter of proving one's own guilt by making a statement. Such a promise is a truly powerful one, going to the heart of a declarant's reservations about giving a statement.[31]

Other courts have reached the same conclusion. In *State v. Nash*,[32] the Nebraska Supreme Court ruled that a defendant's statement made to the police in the presence of his attorney was rendered involuntary and inadmissible when the police promised the statement would be confidential.[33] And in *State v. McConkie*,[34] the Maine Supreme Judicial Court held that the defendant's non-custodial statement to the police was involuntary.[35] The officer interviewing McConkie

told him that what he said in the interview would "stay [ ] confidential."[36] The court reasoned that the statement was involuntary because the police officer affirmatively misled McConkie as to his constitutionally protected right against self-incrimination.[37]

In *United States v. Swint*,[38] the court held that Swint's statements during an interview were involuntary when no government agents told Swint that the interview to discuss potential assistance Swint could provide in other prosecutions would not be off the record, contrary to the reasonable understanding of Swint and his attorney.[39] Also in *Linares v. State*,[40] the court held that the defendant's incriminating statements were involuntary when made after a police officer promised that nothing the defendant said would be used against him.[41]

In the related area of determining whether a waiver of *Miranda* rights is voluntary, the California Supreme Court held that a waiver was involuntary when a defendant asked to speak to an officer "off the record," and the officer agreed.[42] The court explained that in asking to speak confidentially, the defendant demonstrated that he did not understand the nature of his rights, a prerequisite to a valid waiver:

> A request to speak "off the record" cannot constitute a knowing and intelligent waiver of rights which include the advisement that "anything (a suspect) says can be used against him in a court of law." Indeed, defendant's request revealed a marked lack of understanding of the Miranda warnings. [The officer] then contributed to defendant's lack of understanding by agreeing to the request rather than in-

29. *Id.* at 833–35.

30. *Id.* at 837.

31. *Id.* at 836 (citations omitted).

32. 228 Neb. 69, 421 N.W.2d 41 (1988).

33. *Id.* at 43–44.

34. 755 A.2d 1075 (Me.2000).

35. *Id.* at 1078.

36. *Id.* at 1077.

37. *Id.* at 1078.

38. 15 F.3d 286 (3rd Cir.1994).

39. *Id.* at 290.

40. 266 Ga. 812, 471 S.E.2d 208 (1996).

41. *Id.* at 212, 471 S.E.2d 208.

42. *People v. Braeseke*, 25 Cal.3d 691, 159 Cal. Rptr. 684, 602 P.2d 384, 391 (1979).

forming defendant that there could be no such thing as an off the record discussion.[43]

Similarly, in *State v. Stanga*,[44] the South Dakota Supreme Court held that the police subverted the required *Miranda* warning that any admissions can be used in court by promising that any statements the defendant made were "between you and me." [45]

Promises that a statement will remain confidential or will not be used against the declarant appear similar to promises of leniency or immunity from prosecution. In these situations, the declarant is made to believe his statements would not be used to prove his guilt in court. In *Edwards v. State*,[46] we held that "[t]he police are ... barred from promising benefits such as immunity from prosecution that would cause a suspect to put aside normal efforts at self-preservation." [47] And in *Smith v. State*,[48] we held that a confession plainly induced by a promise of leniency must be deemed involuntary.[49]

In this case, Jones did not give incriminating information until he was assured by the police that his statement was off the record. Only after receiving that assurance did Jones provide the police with the detailed information about his sexual misconduct that the State used against Jones at trial. From our review of the record, and considering the totality of the circumstances, we conclude that Jones's statement was plainly induced by the officer's agreement that the conversation would be "off the record." Therefore, we conclude that Jones's subsequent statement was involuntary.

*Was admission of the involuntary statement harmless error?*

▮ The State argues that even if Jones's statement is involuntary, admission of the statement was harmless error. When consti-tutional error has occurred, the test is whether the State has proved beyond a reasonable doubt that the error did not contribute to the verdict.[50] But Jones's statement provided evidence on several essential elements of both sexual assault and sexual abuse of a minor. The State relied on Jones's statement to rehabilitate E.C.'s testimony after she was impeached. And the statement allowed the jury to hear, in Jones's own words, a graphic description of his misconduct. The jury heard Jones's statement that he knew that E.C. was afraid, and that she was "not into it."

The State relied on Jones's statement throughout its case. In its opening, the State said that there were four ways to prove its case, one of which was Jones's own statement that corroborated E.C.'s version of events. Detective Strahle testified as to what Jones said during the interview, including that he changed his story, that he admitted having intercourse and fellatio with E.C., that he admitted "switching" sex positions with Pruitt, that he admitted that he knew E.C. was scared, that he was scared he might look weak, and that he watched while "Short" had sex with E.C. In its closing argument, the State reiterated that there were four ways to prove its case. The State stressed that Jones had changed his story during the interview, first denying all involvement. It also argued that Jones must have known E.C. was younger than sixteen because he knew her older sister was only sixteen or seventeen. Throughout its argument, the State emphasized how Jones's statement corroborated E.C.'s testimony. The State relied entirely on Jones's statements to prove that he was reckless in his disregard of E.C.'s lack of consent, a necessary element of the

---

43. *Id.* (citations omitted).

44. 617 N.W.2d 486 (S.D.2000).

45. *Id.* at 487.

46. 842 P.2d 1281 (Alaska App.1992).

47. *Id.* at 1285 (citing *Smith v. State*, 787 P.2d 1038 (Alaska App.1990)).

48. 787 P.2d 1038 (Alaska App.1990).

49. *Id.* at 1039.

50. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Love v. State*, 457 P.2d 622, 631 (Alaska 1969). *Compare Motta v. State*, 911 P.2d 34, 39–40 (Alaska App. 1996) (citing *Arizona v. Fulminante*, 499 U.S. 279, 306–12, 111 S.Ct. 1246, 1262–66, 113 L.Ed.2d 302 (1991)) (The constitutional harmless error standard applies when a confession is admitted in violation of defendant's *Miranda* rights).

sexual assault charges. From our review of the record, we conclude that admission of Jones's involuntary statement was not harmless error.

Because we conclude that admission of the involuntary statement was not harmless error beyond a reasonable doubt, we must reverse Jones's conviction. Because we have reversed his conviction, we need not resolve the other claim that Jones raised in this appeal.

*Conclusion*

The judgment of the superior court is REVERSED.