**Michael L. ROCKWELL, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–9748.**

Court of Appeals of Alaska.

Feb. 15, 2008.

offenders convicted of a class B felony.

Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

Michael L. Rockwell appeals his convictions for felony driving while under the influence and driving while license cancelled, suspended, or revoked.[1] Rockwell's principal argument on appeal is that he was subjected to custodial interrogation in violation of *Miranda v. Arizona*,[2] and that the superior court should have suppressed the statements he made during that interrogation. As explained in this opinion, we agree that Rockwell's *Miranda* rights were violated during the latter portions of his interrogation, and we believe there is a reasonable possibility that his *Miranda* rights were violated during an earlier portion of the interrogation. We therefore remand Rockwell's case to the superior court for additional findings on what specific evidence must be suppressed, and on whether Rockwell's conviction must be reversed because of the suppression of this evidence.

Rockwell also argues that the superior court erroneously admitted certain hearsay evidence at his trial. We conclude that each challenged item of evidence was admissible under an exception to the hearsay rule.

### Underlying facts and proceedings

In the early morning hours of January 16, 2004, two cars crashed at the intersection of Dimond Boulevard and New Seward Highway. Officer Amanda Patton of the Anchorage Police Department saw Rockwell exit the driver's side of one of the cars and walk towards the driver of the other car involved in the accident. The two drivers started arguing, and Patton separated them. When Patton spoke with Rockwell, he first said that he had been driving, but shortly thereafter claimed that he had not been driving.

Officer Stephen Busby arrived at the scene and contacted Rockwell while Officer Patton questioned the driver of the other vehicle involved in the accident. The driver of the other vehicle told Patton that he saw someone run away from the passenger side of Rockwell's car, but he identified Rockwell as the driver.

When Officer Busby contacted Rockwell, Rockwell was standing in the middle of the street; Busby asked Rockwell to step over to his patrol vehicle. Busby noticed that Rockwell had bloodshot, watery eyes and appeared to be intoxicated. Rockwell admitted that he was intoxicated and that his license was revoked. However, Rockwell told Busby that another man—Joshua Fagg—had been driving the car.

Busby then asked Rockwell to sit in the backseat of his patrol car. According to the testimony, Busby asked Rockwell to get into the patrol car because it was cold outside. Busby told Rockwell that he was not under arrest. However, Busby conducted a pat-down search of Rockwell's clothing for weapons before Rockwell got into the car. During this search, Busby found the keys to Rockwell's car in Rockwell's back pocket.

Once in the vehicle, Busby turned on an audio recorder and asked Rockwell more questions. During this questioning, Busby informed Rockwell that he was going to take him to the police substation at the Dimond Mall, approximately two blocks away, to administer field sobriety tests.

Once they arrived at the Dimond Mall substation, Busby administered field sobriety tests to Rockwell and continued to question him. Based on Rockwell's performance on the field sobriety tests, Busby arrested Rockwell for driving while under the influence.

Busby then took Rockwell to a second police substation for breath testing. The result of the breath test was a .130 percent alcohol level. After Rockwell took the breath test, Busby advised him of his *Miranda* rights.

After Rockwell was advised of his rights, he demanded an attorney. It was approximately 4:00 a.m. at this time. Busby offered Rockwell the chance to immediately call an attorney, but Rockwell declined to make a phone call. Busby then continued to question Rockwell.

---

1. AS 28.35.030(n) & AS 28.15.291(a)(1), respectively.

2. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

After Rockwell was charged with felony driving while under the influence and driving while his license was cancelled, suspended, or revoked, he asked the superior court to suppress the statements he made to Busby. Rockwell asserted that he was subjected to custodial interrogation before he received *Miranda* warnings. He also asserted that, after he received the warnings and invoked his right to counsel, Busby ignored his request for counsel and continued to interrogate him.

Superior Court Judge Michael L. Wolverton held an evidentiary hearing on Rockwell's suppression motion. Following this hearing, Judge Wolverton denied Rockwell's motion in a one-paragraph written order. In this order, Judge Wolverton declared that Rockwell had not been in custody at any pertinent time, but the judge did not make any specific findings of fact.

Rockwell's trial was held before Superior Court Judge John Suddock. Rockwell's defense was that he had not been driving the car. He again identified Joshua Fagg as the driver. To rebut this claim, the State called Fagg as a witness. Fagg testified that he had been traveling in South America at the time of this incident. Fagg produced his passport, a bus ticket, and an Andean immigration card to corroborate his testimony.

Rockwell received copies of Fagg's bus ticket and Andean immigration card on the afternoon before the trial started. Rockwell asked Judge Suddock for a continuance to investigate these documents, but the judge denied the requested continuance.

The jury convicted Rockwell of both counts. Rockwell now appeals.

*Analysis of Rockwell's claims*

*The Miranda issues*

■ A police officer must advise a suspect of the *Miranda* rights, and must obtain the suspect's waiver of those rights, before subjecting the suspect to custodial interrogation.[3]

■ Normally, an investigative stop is not considered "custody" for *Miranda* purposes.[4] In *Berkemer v. McCarty*,[5] the United States Supreme Court held that a police officer need not give *Miranda* warnings to a motorist who is subjected to roadside questioning during a routine traffic stop.[6] We followed this rule in *Blake v. State*,[7] holding that police officers are not required to give *Miranda* warnings during a traffic stop unless and until the initial stop ripens into full-blown "custody." [8]

■ In *Hunter v. State*,[9] the Alaska Supreme Court announced an objective test for determining whether a person is in custody for purposes of *Miranda*.[10] Custody occurs when there is "some actual indication of custody, such that a reasonable person would feel he was not free to leave and break off police questioning." [11]

The supreme court defined the factors to consider as follows:

> At least three groups of facts would be relevant to this determination. The first are those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as

3. *Halberg v. State*, 903 P.2d 1090, 1093 (Alaska App.1995).

4. *Tagala v. State*, 812 P.2d 604, 608 (Alaska App. 1991) (citing *Berkemer v. McCarty*, 468 U.S. 420, 440–43, 104 S.Ct. 3138, 3150–52, 82 L.Ed.2d 317 (1984)).

5. 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

6. *Id.*, 468 U.S. at 440, 104 S.Ct. at 3150 (*citing Terry v. Ohio*, 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)).

7. 763 P.2d 511 (Alaska App.1988).

8. *Id.*, 763 P.2d at 515.

9. 590 P.2d 888 (Alaska 1979).

10. *Id.*, 590 P.2d at 895.

11. *Id.*

drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning.[12]

For present purposes, we divide Busby's interrogation of Rockwell into four phases:

(1) the initial contact on the street at the scene of the accident;

(2) the interrogation inside Busby's patrol car up to the point when Busby announced to Rockwell that he was going to transport him to the Dimond Mall police substation;

(3) the continued interrogation inside the patrol car after Busby's announcement, as well as the ensuing interrogation at the two police substations until Rockwell was finally advised of his *Miranda* rights; and

(4) the interrogation that took place after Rockwell was advised of his *Miranda* rights and asserted his right to counsel.

*The lack of factual findings by the superior court*

As we noted above, Judge Wolverton made no findings of fact when he decided Rockwell's suppression motion. In this omission, the judge departed from the mandate of Alaska Criminal Rule 12(d), which states that "[when] factual issues are involved in determining a motion to suppress evidence, the court shall state its essential findings on the record." In other words, a trial judge ruling on a suppression motion must explicitly state all findings of fact essential to a determination of the issues raised.

In the past, when trial judges failed to make the findings required by Criminal Rule 12(d), we have declined to apply the normal presumption that all factual issues not specifically addressed by the judge were resolved in the manner most favorable to upholding the judge's ruling. Instead, we have directed trial judges to comply with Rule 12(d) and make express findings on the essential factual issues presented by the suppression motion.[13]

However, we conclude that we can resolve the admissibility of Rockwell's statements during the first, third, and fourth portions of the interrogation without explicit findings of fact.

Even viewing the evidence in the light most favorable to Rockwell, his statements during the first portion of the interrogation—that is, the statements he made when he and Busby were standing on the street at the scene of the accident—were not the product of custodial interrogation.

And, even viewing the evidence in the light most favorable to the State, Rockwell was in custody for *Miranda* purposes during the third and fourth portions of the interrogation—that is, after Busby told Rockwell that he was going to transport him to the police substation.

This leaves the statements that Rockwell made during the second portion of the interrogation—the statements that Rockwell made while he was sitting in Busby's patrol car, but before Busby announced that Rockwell would be taken to the police substation. We conclude that we must direct the superior court to make explicit findings concerning the facts of this portion of the interrogation.

*The initial contact on the street*

■ When Busby arrived at the scene of the accident, Rockwell was engaged in an argument with the driver of the other car involved in the accident. Both Officer Patton

---

12. *Id.* (footnote omitted).

13. *See Flynn v. State,* 847 P.2d 1073, 1077 n. 2 (Alaska App.1993); *Long v. State,* 837 P.2d 737, 742 (Alaska App.1992); *Burks v. State,* 706 P.2d 1190, 1191 (Alaska App.1985); *Johnson v. State,* 631 P.2d 508, 513–14 (Alaska App.1981).

and the driver of the other vehicle identified Rockwell as the driver of his car. Busby noticed that Rockwell smelled of alcohol. Busby approached Rockwell and asked him about the accident that had just occurred, including questions about who had been driving Rockwell's car, and whether Rockwell had been drinking. Rockwell conceded that he was drunk, but he told Busby that he was not the driver of the car. Rockwell identified the driver as Joshua Fagg. Rockwell claimed that Fagg had run away following the crash.

This initial portion of Rockwell's encounter with Busby resulted from the fact that Rockwell had been in a traffic accident, and the police had responded to render assistance and investigate the accident. Busby questioned Rockwell while both of them were standing on the street, close to where the collision occurred. The questions that Busby posed to Rockwell were appropriate, given the circumstances and Busby's legitimate investigative purpose.

The test for *Miranda* custody is usually stated as whether "a reasonable person would feel he was not free to leave and break off police questioning." [14] This formulation of the test arguably suggests that *Miranda* warnings are required in any situation where a person is detained or "seized" for Fourth Amendment purposes, but the rule is not that broad. As we explained in *Winterrowd v. Anchorage*, [15]

> The cases applying *Miranda* recognize that there are some Fourth Amendment seizures of temporary duration—most notably, routine traffic stops and other investigative stops—in which *Miranda* warnings are not required, even though the person is temporarily in custody and the police can properly ignore a request that the officers depart and leave the person alone. [16]

It is true that Busby testified that he would not have allowed Rockwell to leave, and a reasonable person in Rockwell's position would probably not have believed that they were free to walk away during the accident investigation. Nevertheless, this type of brief investigative detention does not constitute *Miranda* custody. Therefore, Busby was not required to give *Miranda* warnings before questioning Rockwell on the street, and Rockwell's statements during this encounter are admissible.

### The questioning inside the patrol car

■ After this initial questioning, Busby asked Rockwell to get into the backseat of his patrol car. According to Busby's testimony, he made this request because it was cold outside, and because he wanted to get Rockwell away from traffic and away from the driver of the other car.

Busby told Rockwell that he was not under arrest, and he did not handcuff Rockwell when Rockwell got into the patrol car. However, before Rockwell got into the car, Busby conducted a pat-down search of Rockwell's clothing. During this pat-down, Busby felt a lump in Rockwell's back pocket. The officer reached into Rockwell's pocket and removed the lump—which proved to be the keys to Rockwell's car.

Busby recorded his questioning of Rockwell inside the patrol car. Busby questioned Rockwell concerning his identity, his car insurance, and how Busby might contact Joshua Fagg, the person who Rockwell identified as the driver of the car. Busby then got out of the patrol car, leaving Rockwell in the backseat.

When Busby returned, he informed Rockwell that he was going to drive him to the Dimond Mall police substation because he wanted Rockwell to perform field sobriety tests there. Busby then resumed his questioning of Rockwell. Busby asked Rockwell if he had been riding in the passenger seat of the car the entire time before the accident; Rockwell answered "yes." Busby then asked Rockwell to explain how he had the car keys in his pocket. Rockwell answered that he was not sure, but that he must have grabbed the keys at some point.

At this point, Busby stepped out of the patrol car again. When he re-entered the

14. *Hunter,* 590 P.2d at 895.

15. 139 P.3d 590 (Alaska App.2006).

16. *Id.* at 591.

car, he again asked Rockwell how to contact Fagg, and he also asked if Rockwell needed any medical assistance. Busby then drove Rockwell to the Dimond Mall substation.

We conclude that, even viewing the evidence in the light most favorable to the State, Rockwell was in custody for *Miranda* purposes from the time Busby told him that he was going to be transported to the police substation for testing. When the police conduct an investigative stop, they "must not require the person stopped to travel an appreciable distance." [17]

Here, Busby did not ask Rockwell to consent to be transported to the police substation. Rather, Busby simply announced to Rockwell that he would be transported. From this point on, Rockwell was in custody, and he should have been advised of his *Miranda* rights before any further questioning. Thus, any subsequent answers that Rockwell gave to Busby without a *Miranda* warning must be suppressed.

■ This leaves the issue of the admissibility of the statements Rockwell made inside the patrol car, before Busby announced that Rockwell would be taken to the substation. Rockwell argues that he was in custody for *Miranda* purposes from the time he first entered Busby's patrol car.

The mere fact that Rockwell took a seat in the patrol car does not establish that Rockwell was in custody for purposes of *Miranda*. However, in *Waring v. State*[18] the Alaska Supreme Court ruled that when a police officer instructs—as opposed to invites—a person to sit in a patrol car, the officer is conducting a Fourth Amendment seizure.[19]

In Rockwell's case, Busby testified that he did not instruct Rockwell to sit in the patrol car. Rather, Busby testified that he asked Rockwell to sit in the patrol car, and that Rockwell agreed to do so, or at least did not protest. This testimony suggests that Rockwell was not in custody.

However, just before Rockwell got into the patrol car, Busby conducted the pat-down search and removed Rockwell's car keys from his pocket. In their briefs to this court, both parties assume that Busby retained these keys—but this is not immediately apparent from the record.

The only mention of the car keys at the evidentiary hearing was Busby's testimony that he had asked Rockwell "about the keys being in his pocket." At trial, Busby testified that when he conducted the pat-down search of Rockwell, he felt a lump in Rockwell's back pocket, then reached in and removed a set of keys that Rockwell identified as the keys to his vehicle. But Busby's testimony did not address the issue of whether he retained these keys after he found them.

Rockwell also points out that he could not get out of the back seat of Busby's patrol car without Busby's assistance—since the rear doors of the car did not open from the inside. (Busby testified that the rear doors of the patrol car open only from the outside.) But there was no testimony that Rockwell knew that he was unable to get out of the backseat of the patrol car unless the officer let him out.

Given all of these circumstances, and depending on how the facts are viewed, there is at least a reasonable possibility that Rockwell was in custody for *Miranda* purposes when he entered Busby's patrol car. Because we do not have findings on all the pertinent facts, we cannot resolve this issue. We therefore direct the superior court to make findings on this issue as required by Criminal Rule 12(d).

*The questioning at the Dimond Mall substation*

■ Busby transported Rockwell to the Dimond Mall substation for field sobriety testing. Upon arriving at the substation, Busby engaged in further interrogation of Rockwell. And after Busby administered the field sobriety tests, he continued to ask

---

**17.** *Howard v. State*, 664 P.2d 603, 610 (Alaska App.1983).

**18.** 670 P.2d 357 (Alaska 1983).

**19.** *Id.* at 364 (*citing* 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.2, at 53, 54 (1978) (footnote omitted)).

Rockwell questions about what, when, and where he had been drinking, how much he had to drink, and who was with him at the time. After this questioning, and based on Rockwell's performance on the field sobriety tests, Busby informed Rockwell that he was under arrest for driving while under the influence. He then transported Rockwell to a different police substation for breath testing.

As we explained in the preceding section of this opinion, Rockwell was in custody for *Miranda* purposes throughout this questioning at the Dimond Mall substation. Because Rockwell did not receive *Miranda* warnings before he answered Busby's questions, all of Rockwell's statements in response to these questions must be suppressed.

*The advisement of Miranda rights, and the questioning at the second police substation*

■ After Busby formally arrested Rockwell and transported him to the second police substation for breath testing, Busby finally advised Rockwell of his *Miranda* rights. Rockwell then asked for an attorney. Busby offered Rockwell a phone, but Rockwell declined to call an attorney.

Busby then asked Rockwell if he would answer more questions. Rockwell agreed, and Busby resumed his interrogation.

On appeal, Rockwell argues that Busby violated his right to counsel when he continued to question him after he requested an attorney. The State relies on *Hampel v. State*,[20] in which this court ruled that, after a suspect in custody refers to his right to counsel in an ambiguous or equivocal way, any further police questioning "must be limited to clarifying the reference." [21] But there was nothing equivocal about Rockwell's demand for an attorney. Rockwell exclaimed that he wanted "a lawyer now!"

■ When a suspect in custody invokes his right to counsel, the police must stop all questioning until counsel is present, unless the defendant initiates the discussion.[22] In *Edwards v. Arizona*,[23] the United States Supreme Court held that when a suspect invokes his right to counsel, the police must cease all questioning of the suspect and cannot re-initiate questioning until the suspect has had the opportunity to consult an attorney.[24] The Supreme Court stated:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [A]n accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.[25]

■ Rockwell did not initiate a new discussion with Busby after he stated that he wanted an attorney. Instead, Busby asked Rockwell if he was willing to answer more questions. After Rockwell agreed, Busby continued to interrogate Rockwell. This procedure does not satisfy *Edwards*. The fact that Rockwell agreed to respond to further police-initiated questioning was not a valid waiver of his right to counsel. Therefore, Rockwell's ensuing statements must be suppressed.

*What the superior court must do on remand*

As we have explained here, the statements that Rockwell made to Busby during their

**20.** 706 P.2d 1173 (Alaska App.1985).

**21.** *Id.* at 1180 (*citing Giacomazzi v. State*, 633 P.2d 218, 222 (Alaska 1981)).

**22.** *Tagala v. State*, 812 P.2d 604, 609 (Alaska App.1991) (*citing Arizona v. Roberson*, 486 U.S. 675, 677, 108 S.Ct. 2093, 2096, 100 L.Ed.2d 704 (1988); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981)).

**23.** 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

**24.** *Id.*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

**25.** *Id.*

initial encounter on the street at the scene of the motor vehicle accident are admissible. However, all the statements that Rockwell made to Busby after Busby announced that he was going to transport Rockwell to the Dimond Mall substation should have been suppressed. Some of these statements must be suppressed because Rockwell was subjected to custodial interrogation without first being advised of his *Miranda* rights, and the remainder of the statements must be suppressed because, after Rockwell was advised of his rights, Busby ignored Rockwell's invocation of the right to counsel.

This leaves the issue of the admissibility of the statements that Rockwell made while sitting in Busby's patrol car, before Busby announced that Rockwell was going to be transported to the police substation. The superior court must make findings of fact regarding the precise circumstances of this portion of the encounter. Based on these findings, the superior court must then determine whether Rockwell was in custody for *Miranda* purposes. If Rockwell was in custody, then his *Miranda* rights were violated, and the statements he made in response to Busby's questioning must be suppressed.

After the superior court determines which of Rockwell's statements must be suppressed, the court must determine which of these statements were introduced by the State at Rockwell's trial, and then determine whether the introduction of these statements requires reversal of Rockwell's convictions.

(On this last issue, we note that many of Rockwell's statements to Busby during these latter portions of the interrogation seemingly support the defense that Rockwell offered at trial, and they are seemingly redundant of the admissible statements that Rockwell made when Busby first questioned him on the street—*i.e.*, Rockwell's assertion that Joshua Fagg had been driving the car, and that Fagg had fled the scene following the accident.)

*Rockwell's hearsay claims*

The State called Joshua Fagg as a witness at trial. Fagg testified that he knew Rockwell because, several years earlier, they both worked at an Anchorage restaurant. Fagg further testified that he was traveling in Ecuador and Peru from November 2003 through March 2004.

During Fagg's testimony, the State asked him to identify several documents that corroborated his assertion about being out of the country: Fagg's United States passport, an Andean immigration card that Fagg filled out in preparation for his entry into Peru, and a bus ticket that Fagg purchased in Peru.

Fagg pointed out that his passport contained dated stamps that were placed in his passport by government officials when he entered and returned from these foreign countries. These passport stamps showed that Fagg entered Ecuador on November 26, 2003, that he entered Peru on December 27, 2003, and that he departed Peru on March 23, 2004. Fagg also identified an immigration card that he prepared while on the flight from Ecuador to Peru on December 27, 2003. Fagg testified that this immigration card was date-stamped by a Peruvian government official when Fagg arrived in Peru. He also identified a bus ticket that was issued to him on February 1, 2004, for a bus trip in Peru.

The superior court admitted all of these exhibits over Rockwell's hearsay objections.

On appeal, Rockwell argues that the bus ticket and immigration card offered by the State to show that Fagg was out of the country on the date of the accident were irrelevant. He points out that the date on the bus ticket—02–01–2004—was January 2, 2004, and not February 1, 2004, as the parties assumed at trial. (In most countries in the world, including all of South America, the first digits in a date refer to the day, not the month.)[26] Rockwell argues that if the immigration card had a date stamp of December 27, 2003, and the bus ticket was dated January 2, 2004, then both pieces of evidence

---

**26.** *See* the Wikipedia article, "Calendar Date," found at: http://en.wikipedia.org/wiki/Calendar_ date

were irrelevant because they do not show that Fagg was outside of Anchorage on January 16, 2004, the date of the accident.

At trial, Rockwell did not claim that the evidence was irrelevant, so he must show plain error.[27] Even if there was a misunderstanding regarding the date that the bus ticket was issued in Peru, the evidence was still relevant. Rockwell contended that Fagg was driving on January 16, 2004, and the immigration card and the bus ticket supported Fagg's testimony that he was out of the country on January 16, 2004. This evidence tended to disprove Rockwell's defense and, in context, tended to prove the State's case that Rockwell was driving.

Rockwell contends that while passports may be admissible under Evidence Rule 803(8) (the public records exception), the stamps contained in Fagg's passport constituted hearsay. Rockwell argues that under *United States v. Friedman*,[28] in order for records to be admissible under the public records exception, they must be kept by the country that issues them. Because the passport stamps are not records that are kept by a country, Rockwell argues they are inadmissible.

But *Friedman* does not require that evidence be kept by the public office that issues it in order for it to qualify as admissible hearsay under the public records exception. *Friedman* held that immigration records that were physically kept by the Chilean government and could be made into a written summary by a Chilean official qualify as admissible hearsay under Rule 803(24) of the

Federal Rules of Evidence, the "catch all" exception.[29]

The State, relying on *Harris v. State*,[30] contends that there is no requirement that a public record be kept by a government in order to be admissible to public records exception. In *Harris*, the record at issue was a business record.[31] The State argues that "[t]here is no sound reason for treating the public records differently."

Harris was charged with forging traveler's checks.[32] During his trial, Harris objected to a bank officer's identification of stamps on the face of traveler's checks, and his testimony that the stamps were part of the normal procedure when dealing with the checks.[33] Harris argued that the officer's testimony was hearsay. We upheld the trial court's ruling that the testimony was admissible as a business record under Evidence Rule 803(6).[34]

Other cases have upheld the admission of passports into evidence. *United States v. Pluta*[35] addressed the admission of passports and their content as public records.[36] In *Pluta*, the passport evidence was admitted to identify the nationality of the passport holders.[37] In *United States v. Eltayib*,[38] the court upheld the admission of passport evidence to prove that a person entered a country.[39] The crew of a freighter traveling from Venezuela off loaded a large cocaine shipment eighty miles off the coast of New Jersey.[40] The government introduced the passports of the ship's crew to establish that the

**27.** *See, e.g., Gilbert v. State*, 598 P.2d 87, 92 (Alaska 1979) (noting that, pursuant to Rule 47(b) of the Alaska Rules of Criminal Procedure, error that was not brought to the attention of the trial court will not be considered on appeal unless it affects a substantive right and is obviously prejudicial).

**28.** 593 F.2d 109 (9th Cir.1979).

**29.** *Id.* at 118–19.

**30.** 678 P.2d 397 (Alaska App.1984), *rev'd opn other grounds, Stephan v. State*, 711 P.2d 1156 (Alaska 1985).

**31.** *Id.* at 406.

**32.** *Id.* at 399.

**33.** *Id.* at 406.

**34.** *Id.*

**35.** 176 F.3d 43 (2nd Cir.1999).

**36.** *Id.* at 50–51.

**37.** *Id.*

**38.** 88 F.3d 157 (2nd Cir.1996).

**39.** *Id.* at 169.

**40.** *Id.* at 161–64.

defendants entered Venezuela.[41] The court concluded that the passport evidence had important probative value on the issue of whether the defendants had entered Venezuela.[42] In *United States v. Akbar*,[43] the court upheld the trial court's admission of the defendant's passport that was marked with a Cuban stamp as evidence that the passport was stamped in Cuba while in the defendant's possession.[44]

▮ Fagg's passport and the stamps placed in his passport by foreign government officials when he entered the foreign country (as reflected in Fagg's testimony) fall within the public records exception to the hearsay rule, Evidence Rule 803(8). The passport and stamps are "records" that are administered by a public office or agency. A passport is issued by the government to an individual to show the citizenship and identity of the holder. The government officials that stamp passports do so on a regular basis to record the entry of travelers holding passports. Judge Suddock properly rejected Rockwell's hearsay objection to this evidence.

▮ Rockwell also argues that the bus ticket and the immigration card were not admissible. We conclude that the immigration card was admissible under Evidence Rule 803(8). Fagg's testimony provided the foundation for the card. He prepared the card for entry into Peru, and the card was stamped by a Peruvian government official in the course of normal governmental duties. The card was not prepared in anticipation of litigation.

▮ We conclude that the bus ticket was admissible as a business record under Evidence Rule 803(6). Fagg testified that he purchased the ticket in Peru to travel between two cities. His testimony provided the foundation for the admission of the ticket because his testimony showed that he obtained the ticket after paying for it in order to travel. Thus, his testimony showed that the ticket he possessed was issued in the course of a regularly conducted business, and that it reflected his payment of the bus fare for the scheduled travel.

▮ Rockwell next argues that the admission of the passport and the immigration stamps violated his right to confrontation under the Sixth Amendment as interpreted by the United States Supreme Court in *Crawford v. Washington*.[45] *Crawford* holds that under the Confrontation Clause, the government cannot introduce "testimonial hearsay" against a criminal defendant unless the hearsay declarant testifies at trial, or the government proves that the hearsay declarant is unavailable and that the defendant previously had a fair opportunity to cross-examine the declarant.[46] The Supreme Court gave three formulations of the "core class of 'testimonial' statements": (1) "*[E]x parte* in-court testimony or its functional equivalent . . . such as affidavits, custodial examinations, and prior testimony where the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially[ ]"; (2) "[E]xtrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions[ ]"; and (3) "[S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]"[47]

Rockwell argues that, according to the holding in *Crawford*, the passport stamps and immigration card should not have been admitted unless he had the opportunity to confront the Peruvian official who stamped them.

In *Abyo v. State*,[48] we addressed whether documents used to verify the calibration of

**41.** *Id.* at 169.

**42.** *Id.*

**43.** 698 F.2d 378 (9th Cir.1983).

**44.** *Id.* at 379.

**45.** 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**46.** *Id.*, 541 U.S. at 68, 124 S.Ct. at 1374.

**47.** *Id.* at 51–52, 124 S.Ct. at 1364 (citations omitted).

**48.** 166 P.3d 55 (Alaska App.2007).

the DataMaster breath test machine were covered by *Crawford.*[49] We noted that, although the Supreme Court did not explicitly define "testimonial" in *Crawford,* the Court stated that business records are, by their nature, not testimonial.[50] Even though the calibration documents were admitted under the public records exception, not the business records exception, we followed substantial authority holding that calibration documents, whether admitted as business records or public records, are not barred by the Confrontation Clause.[51]

The passport stamps and immigration card at issue here were not made and maintained for the primary purpose of criminal investigations, and the government employees who stamped the documents performed a ministerial duty that had nothing to do with prosecuting a particular person for criminal activity. We hold that the passport and immigration card are not "testimonial hearsay" barred by *Crawford.*

### *The superior court properly denied the motion to continue*

Finally, Rockwell argues that the superior court erred when it denied his motion to continue the trial based on the State's disclosure of the bus ticket and the immigration card shortly before trial.

When the parties were in court on April 17, 2006, Rockwell had just been informed that the State had located Fagg and that Fagg was available to testify. The State provided Rockwell with a copy of Fagg's passport. The court granted Rockwell's request for a continuance to the week of April 24, 2006.

The afternoon of April 24, 2006, the State obtained copies of Fagg's immigration card and bus ticket and immediately provided copies to Rockwell. The trial began on April 25, 2006. Rockwell requested another continuance so that he could research and investigate these materials. He claimed that he would be prejudiced by the introduction of the newly disclosed evidence at trial because he did not have time to investigate the documents. The trial court denied Rockwell's request for a continuance, finding that he had adequate notice in advance of trial that the State intended to show that Fagg had been out of the country at the time of the accident.

For this court to reverse the trial court's denial of Rockwell's continuance, Rockwell must demonstrate that the denial "embarrassed [him] in preparing his defense and prejudiced his rights."[52] Rockwell does not assert that the denial of the continuance in some way embarrassed him in preparing a defense or prejudiced his rights. He does argue that the continuance should have been granted because he was not able to investigate the immigration card and bus ticket. But he makes no claim that further investigation would have yielded anything of benefit.

At the time that Rockwell requested a continuance to permit him to investigate the bus ticket and immigration card, he knew that Fagg would be testifying that he was out of the country at the time of the accident, and the State had provided Rockwell with a copy of Fagg's passport. Fagg's passport showed that he was out of the country before and after the dates of the accident; the immigration card and bus ticket merely corroborated what was shown by the passport. Therefore, we uphold Judge Suddock's denial of Rockwell's motion to continue.

### *Conclusion*

We reject Rockwell's attack on the superior court's evidentiary rulings and on the denial of Rockwell's request for a continuance. We remand the case for additional findings as discussed in the section addressing Rockwell's *Miranda* claims. Within ninety days, the superior court shall transmit its findings to this court. When we receive

---

**49.** *Id.* at 58–59.

**50.** *Id.* at 59 (*citing Crawford,* 541 U.S. at 56, 124 S.Ct. at 1367).

**51.** *Id.* at 59–60 & n. 13.

**52.** *Nielsen v. State,* 623 P.2d 304, 307 (Alaska 1981) (*citing Klockenbrink v. State,* 472 P.2d 958, 964 (Alaska 1970)).

the superior court's findings, we will resume
our consideration of the case.