**Michael ROCKWELL, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–9748.

Court of Appeals of Alaska.

Sept. 4, 2009.

**370**

Renee McFarland, Assistant Public Defender, Anchorage, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Kenneth M. Rosenstein and Eric A. Ringsmuth, Assistant Attorneys General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

Following a two-car collision, Rockwell was convicted of felony driving while under the influence and driving with a revoked license.[1] In his original appeal to this court, he argued, among other things, that the police interrogated him in violation of *Miranda v. Arizona*[2] and his right to counsel, and that, consequently, the superior court should have suppressed the statements he made during that interrogation. In our earlier decision in *Rockwell v. State*, we resolved these claims largely in Rockwell's favor, but remanded the case to the superior court for additional findings on precisely when Rockwell's interrogation became custodial for *Miranda* purposes.[3] We also directed the superior court to determine whether Rockwell was entitled to reversal of his convictions because his statements were erroneously admitted at his trial.[4]

On remand, the superior court held that Rockwell's interrogation became custodial as soon as he was seated in the patrol car for questioning. The court then held that Rockwell was entitled to reversal of his convictions because he might have advanced a different defense if he had not been forced to contend at trial with all of the conflicting statements he made to the police.

For the reasons discussed below, we conclude that the error in admitting Rockwell's statements was harmless beyond a reasonable doubt. We therefore reverse the decision of the superior court and affirm Rockwell's convictions.

### Facts and Proceedings

The facts of this case are recounted in more detail in our earlier opinion. Rockwell was involved in a two-car crash, and shortly afterwards Anchorage Police Officer Amanda Patton saw him get out of the driver's seat of his car.[5] Rockwell initially admitted to Officer Patton that he had been driving, but quickly changed this account and said that he had not been driving.[6]

Officer Patton went to interview the driver of the other car and Officer Stephen Busby asked Rockwell to step over to his patrol car. Officer Busby observed that Rockwell had bloodshot, watery eyes and that he appeared to be intoxicated. Rockwell admitted that he was intoxicated and that his driver's license was revoked. But he claimed that another man, Joshua Fagg, had been driving the car and fled from the scene immediately after the collision.[7]

Officer Busby then asked Rockwell to sit in the backseat of his patrol car; Busby later testified that he asked Rockwell to do this because it was cold outside (about ten degrees Fahrenheit) and to move Rockwell away from traffic.[8] Busby did not handcuff Rockwell and told him that he was not under arrest.[9] But before Rockwell got into the patrol car, Busby searched him for weapons and retrieved the keys to the car from his back pocket.[10] Moreover, Rockwell could not leave the patrol car without Busby's help because the rear doors did not open from the inside—though there was no evidence that Rockwell was ever aware of this.[11]

In the patrol car, Busby questioned Rockwell about his identity and his automobile insurance. Rockwell admitted that he had no insurance, but reiterated that his license was revoked and that he had not been driving. Busby asked Rockwell how he could contact Fagg, the man Rockwell had identi-

1. AS 28.35.030(n) and AS 28.15.291(a)(1), respectively.

2. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. 176 P.3d 14, 22–23 (Alaska App.2008).

4. *Id.* at 23.

5. *Id.* at 17.

6. *Id.*

7. *Id.*

8. *Id.* at 17, 20.

9. *Id.* at 17.

10. *Id.*

11. *Id.* at 21.

fied as the driver.[12] Rockwell replied that he did not know how to contact Fagg, but he described what Fagg was wearing and told Busby which direction Fagg ran after the accident. Busby then left the patrol car for about twenty seconds; when he returned, he told Rockwell that he was going to take him to the police substation for field sobriety tests.[13]

Busby continued to question Rockwell in the patrol car and at the substation, where he administered field sobriety tests.[14] He then arrested Rockwell for driving under the influence and transported him to a second substation for a breath test, which showed a blood alcohol level of .130 percent.[15] After the breath test, Busby advised Rockwell of his *Miranda* rights.[16] Rockwell demanded an attorney, but when Busby offered him a phone to call an attorney, Rockwell declined. Busby continued to question Rockwell.[17]

In our earlier decision, we divided Rockwell's interrogation into four parts: (1) the initial contact on the street at the scene of the accident; (2) the interrogation in the patrol car up until the point Busby announced that he would be transporting Rockwell to the police substation for field sobriety tests; (3) the continued interrogation in the patrol car and at the two substations, up until Rockwell was advised of his *Miranda* rights; and (4) the interrogation after Rockwell was advised of his *Miranda* rights and asserted his right to counsel.[18] We ruled that Rockwell's questioning on the street was not custodial, but that the interrogation became custodial, at the latest, several minutes into the patrol car interview, when Busby announced he was transporting Rockwell to the substation for field sobriety tests.[19] We

also ruled that Rockwell's right to counsel was violated after he was advised of his *Miranda* rights, because the police interrogated him after he had already demanded an attorney.[20]

Because we lacked findings on all of the pertinent facts, we could not determine whether Rockwell was in custody during the first part of the patrol car interview (before Busby announced that he was taking Rockwell to the substation for field sobriety tests). We therefore remanded the case to the superior court for additional findings on when the interview became custodial.[21] We also directed the superior court to determine which of Rockwell's statements should have been excluded at trial, and whether Rockwell was entitled to reversal of his convictions because those statements were admitted—or, alternatively, whether the court's error in admitting the statements was harmless beyond a reasonable doubt.[22]

### The Superior Court's Miranda Custody Analysis

As we discussed in our earlier decision, "police officers are not required to give *Miranda* warnings during a traffic stop unless and until the initial stop ripens into full-blown 'custody.' "[23] Generally a person is in custody when there is "some actual indication of custody, such that a reasonable person would feel he was not free to leave and break off police questioning."[24] When we remanded this case, we viewed the question of whether Rockwell was in custody during the first part of the patrol car interview as hinging on two unresolved factual questions: whether Busby retained Rockwell's keys during the interview, and whether Rockwell

12. *Id.* at 20.

13. *Id.*

14. *Id.* at 17.

15. *Id.*

16. *Id.*

17. *Id.*

18. *Id.* at 19.

19. *Id.*

20. *Id.* at 22.

21. *Id.* at 20–21, 23.

22. *Id.* at 23.

23. *Id.* at 18 (quoting *Blake v. State*, 763 P.2d 511, 515 (Alaska App.1988)).

24. *McCollum v. State*, 808 P.2d 268, 269 (Alaska App.1991) (quoting *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979)).

knew he could not leave the patrol car during the interview because the doors did not open from the inside.[25]

Superior Court Judge Michael L. Wolverton made findings on both of these issues. He found that there was no evidence "to indicate or suggest that Busby ever returned the defendant's keys while he was sitting in the patrol car." He also adopted our observation that there was "no testimony that Rockwell knew that he was unable to get out of the backseat of the patrol car unless the officer let him out." Thus, Judge Wolverton's findings on the custody issue were split: One finding (that Busby kept Rockwell's keys) suggested that Rockwell was in custody, and the other (that Rockwell was unaware he could not open the rear patrol car doors) suggested that he was not.

However, Judge Wolverton did not rely on these findings, at least not expressly, when he reversed his earlier decision and held that Rockwell was in custody throughout the patrol car interview. Instead, Judge Wolverton relied on our general discussion in *Brown v. State*[26] about the psychological pressures inherent in traffic stops. Judge Wolverton concluded that our decision in *Brown*—which was issued after Judge Wolverton's initial order denying Rockwell's motion to suppress—was "instructive, if not decisive, on the [custody] issue."

*Brown* involved a routine traffic stop for an equipment violation: A state trooper stopped Brown because the light illuminating her license plate was dirty.[27] Brown had a valid driver's license and there were no warrants for her arrest, so the trooper decided to let her go with a warning.[28] But the trooper did not tell Brown why he had stopped her, or that he had decided not to issue her a citation; instead, he obtained Brown's consent to search her person and car for both weapons and drugs. During this search, he found a crack cocaine pipe in the lining of Brown's coat, and cocaine in her purse.[29]

We ruled that this search violated article I, section 14 of the Alaska Constitution.[30] We cited several factors to support our conclusion: The search for weapons and drugs was unrelated to the reason for the stop (a traffic violation) and was not supported by any suspicion of criminal activity. The trooper never told Brown why she was stopped, and she was therefore ignorant of the basis for the trooper's assertion of authority over her, with no way of knowing if she had the right to refuse his request. And finally, the trooper never told Brown that she was, or would soon be, free to go.[31]

The circumstances in *Brown*, and the legal issues it raised, are distinct from this case. The question here is not whether the police violated the search and seizure clause of the Alaska Constitution by requesting consent to search for weapons and drugs during a routine traffic stop, but whether Rockwell was in custody for *Miranda* purposes when the police questioned him after a traffic accident.

As Rockwell points out, however, Judge Wolverton did not rely on *Brown* for its legal holding, but for its general discussion of the psychological pressures inherent in traffic stops. Judge Wolverton quoted our observation in *Brown* that an officer "retains the upper hand and the accouterments of authority" during a traffic stop, and that most motorists will not feel free to walk away, and do not know when the officer lacks the authority to detain them.[32] Based on these observations, Judge Wolverton concluded that, in spite of Officer Busby's low-key and quiet demeanor, these psychological pressures were such that a motorist in Rockwell's situation would not feel free to leave.

■ Unlike the defendant in *Brown*, who was never told why she was stopped, Rockwell knew why Officer Busby detained him:

25. *Rockwell,* 176 P.3d at 21.

26. 182 P.3d 624 (Alaska App.2008).

27. *Id.* at 626.

28. *Id.* at 627.

29. *Id.*

30. *Id.* at 634.

31. *Id.*

32. *Id.* at 630.

because he was involved in a vehicle collision. But even if we were to assume that Rockwell did not feel free to leave during the early part of the patrol car interview because of the same psychological pressures present in *Brown*, or in traffic stops generally, that does not establish that Rockwell was in custody for *Miranda* purposes. Both the United States Supreme Court and the Alaska Supreme Court have recognized that "a person who is in custody for [F]ourth [A]mendment purposes, *i.e.,* a person who has been 'seized,' is not necessarily entitled to '*Miranda* warnings.'"[33] *Miranda* warnings are required only if the motorist is detained "under circumstances *substantially more* coercive than the typical traffic stop, and that coercion actually impairs the free exercise of the privilege against self-incrimination...."[34] On the question of whether Rockwell's circumstances met this higher standard, *Brown* offers no real guidance.

In light of Judge Wolverton's findings on remand, it is arguable that Rockwell was in custody during the early part of the patrol car interview. But we need not resolve that question because, even assuming Rockwell was in custody throughout the patrol car interview, the superior court's error in admitting his statements was harmless beyond a reasonable doubt.

### *Admission of Rockwell's Statements was Harmless Error*

#### *Judge Suddock's ruling*

■ On remand, Rockwell's case was transferred to Superior Court Judge John Suddock, who presided over Rockwell's trial, for a decision on whether the error in admitting Rockwell's custodial statements prejudiced the outcome of his trial. Judge Suddock found that the error in admitting Rockwell's statements was not harmless beyond a reasonable doubt, and that Rockwell was therefore entitled to a reversal of his convictions.

■ When evidence obtained in violation of the defendant's constitutional rights is improperly admitted at trial, we apply the standard announced in *Chapman v. California* to assess whether the error entitles the defendant to a reversal.[35] Under *Chapman*, constitutional error is harmless only if the government proves beyond a reasonable doubt that the error "did not contribute to the verdict obtained."[36] The question is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."[37] This standard applies when evaluating whether a defendant was prejudiced by the admission of evidence obtained in violation of *Miranda*[38] or the right to counsel.[39]

When we previously remanded Rockwell's case, we recognized that the superior court's error in admitting Rockwell's statements was potentially harmless under the *Chapman* standard. We noted that many of the statements "seemingly support the defense that Rockwell offered at trial, and they are seemingly redundant of the admissible statements that Rockwell made when Busby first ques-

**33.** *Blake*, 763 P.2d at 514 (citing *Berkemer v. McCarty*, 468 U.S. 420, 437–39, 104 S.Ct. 3138, 3148–50, 82 L.Ed.2d 317 (1984) and *Waring v. State*, 670 P.2d 357, 366 n. 19 (Alaska 1983)); *see also Berkemer*, 468 U.S. at 436–37, 104 S.Ct. at 3148–49 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)) ("[W]e have long acknowledged that 'stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief.'" (alterations in original)).

**34.** *Blake*, 763 P.2d at 515 (emphasis added); *see also McCollum*, 808 P.2d at 269.

**35.** 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**36.** *Id.* at 24, 87 S.Ct. at 828.

**37.** *Id.* at 23, 87 S.Ct. at 827 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)).

**38.** *See McMahan v. State*, 617 P.2d 494, 497 (Alaska 1980); *Scharver v. State*, 561 P.2d 300, 303 (Alaska 1977); *Kalmakoff v. State*, 199 P.3d 1188, 1203 (Alaska App.2009); *Jones v. State*, 65 P.3d 903, 909–10 (Alaska App.2003).

**39.** *See Gunnerud v. State*, 611 P.2d 69, 76 (Alaska 1980); *Lewis v. State*, 779 P.2d 806, 808 (Alaska App.1989).

tioned him on the street—*i.e.,* Rockwell's assertion that Joshua Fagg had been driving the car, and that Fagg had fled the scene following the accident."[40]

Judge Suddock did not apply this analysis. He did not consider whether the erroneously admitted statements supported Rockwell's defense, or were redundant of other admissible evidence. Nor did he base his ultimate conclusion that Rockwell was entitled to reversal of his convictions on a finding that the wrongly admitted statements contributed to the jury's finding of guilt. Instead, Judge Suddock speculated that if the court had properly excluded Rockwell's statements to the police, Rockwell might have abandoned his defense that Fagg was driving and claimed that he lied to the police about Fagg to protect the identity of the "real" driver. Judge Suddock found that the admission of Rockwell's statements to the police "compromised" this alternative defense because the many inconsistencies in Rockwell's statements made him far less credible. "But for the statements," Judge Suddock reasoned, "Rockwell would have been forced to contend with only one lie [that Fagg was driving], understandable in human terms, but not a panoply of details regarding Mr. Fagg."

■ This analysis improperly focused on a hypothetical defense. Harmless error review looks to the record of the actual trial to determine if the court's error contributed to the "verdict obtained."[41] As the United States Supreme Court explained in *Sullivan v. Louisiana:*

> Harmless-error review looks ... to the basis on which "the jury *actually rested* its verdict." The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial

was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.[42]

■ A harmless error analysis cannot be based on speculation about how the defendant *might* have argued his case if there had been no error. Such an analysis would entitle a defendant to reversal in any case where the court could hypothesize an arguably more effective defense strategy. A reviewing court cannot meaningfully predict or assess what verdict a jury might have reached based on a litigation strategy that was never pursued, testimony that was never offered, or impeachment that never took place. The Supreme Court recognized this principle in *Coy v. Iowa,* when it held that the state court's assessment on remand of whether a violation of the defendant's constitutional right to confront a witness was harmless "cannot include consideration of whether the witness'[s] testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation."[43]

Alaska courts have similarly recognized that harmless error review cannot be based on speculation. For instance, in *State v. Wickham,* the Alaska Supreme Court held that a defendant must testify to preserve a claim that the trial court erred in ruling that the State could impeach a defendant's testimony with evidence of his prior convictions.[44] The supreme court reasoned that "the factual vacuum caused by the absence of the defendant's testimony creates an unacceptable level of speculation when making the harmless error determination."[45]

40. *Rockwell,* 176 P.3d at 23.

41. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

42. 508 U.S. 275, 279, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993) (emphasis in original) (internal citations omitted) (quoting *Yates v. Evatt,* 500 U.S. 391, 404, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991), *overruled on other grounds by Estelle v. McGuire,* 502 U.S. 62, 72 n.

4, 112 S.Ct. 475, 482 n. 4, 116 L.Ed.2d 385 (1991)).

43. 487 U.S. 1012, 1021, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988).

44. 796 P.2d 1354, 1358 (Alaska 1990).

45. *Id.*

Likewise, in *Sam v. State*,[46] we held that a defendant who abandoned his diminished-capacity defense could not later claim that the court erred by preliminarily ruling that the State would be entitled to call an expert to rebut that defense if it was offered. Citing *Wickham*, we noted "the inherent uncertainty and artificiality of applying a harmless error analysis in a purely hypothetical or abstract context...." [47] In *Sam*, this uncertainty was pronounced: There was no offer of proof detailing Sam's diminished capacity defense or the State's rebuttal testimony; nor did the State unequivocally commit itself to calling the expert.[48] We thus concluded that "[a]ny attempt to divine the likely effect of the alleged error in these circumstances would amount to pure speculation." [49]

In this case, Judge Suddock's harmless error analysis hinged on the speculative assumption that Rockwell would have presented a different defense if his statements had been properly excluded at trial. But Rockwell never advanced this alternative defense in the superior court, and there was no offer of proof detailing the evidence he would have offered to support the defense, or the evidence the State would have presented to rebut it. We do not know if Rockwell would have taken the stand and testified that someone other than Fagg was the driver, or whether the State would have sought to admit Rockwell's suppressed statements to impeach that testimony.[50] As in *Wickham* and *Sam*, we cannot divine the likely effect of the court's error in this purely hypothetical context.

That is not to say that our assessment of whether a defendant is prejudiced by a trial court's error may never take account of the effect of that error on the defendant's trial strategy. We considered, but did not resolve, this question in *Motta v. State*.[51] In *Motta*, the defendant's confession was admitted at trial, and the defendant then testified to essentially the same version of events contained in that confession.[52] After we determined that the court erred in admitting Motta's confession, we asked the parties for additional briefing on whether our harmless error analysis should take into account the possibility that Motta might not have testified, or might have testified differently, if the court had granted his suppression motion.[53] In our subsequent memorandum decision, we noted that there was some authority holding that a defendant's trial testimony is tainted if he is compelled to testify to overcome the impact of an illegally obtained confession.[54] But we reached no decision on whether to follow that authority in Motta's case, because we concluded that his testimony was not so tainted.[55]

There is no indication in this case that Rockwell's chosen defense was compelled by the court's error in admitting his illegally obtained statements. Rockwell never asserted in superior court, or in his original briefing on appeal (that is, in the briefing he submitted before his case was remanded), that he would have argued his case differently had his motion to suppress been granted—much less that he would have adopted the particular defense that Judge Suddock proposed. Any number of factors might have

**46.** 842 P.2d 596, 598–99 (Alaska App.1992).

**47.** *Id.* at 599.

**48.** *Id.*

**49.** *Id.*

**50.** *See State v. Batts*, 195 P.3d 144, 148 (Alaska App.2008).

**51.** 911 P.2d 34, 41 (Alaska App.1996).

**52.** *Id.* at 38.

**53.** *Id.* at 41.

**54.** *Motta v. State*, Alaska App. Memorandum Opinion and Judgment No. 4227 at 13 n. 24 (June 7, 2000), 2000 WL 727765 at *7 n. 24 (citing *Harrison v. United States*, 392 U.S. 219, 225, 88 S.Ct. 2008, 2011, 20 L.Ed.2d 1047 (1968) ("Having 'released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony.")) (declining to resolve the State's contention that *Harrison* was no longer good authority after *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)).

**55.** *Motta*, 911 P.2d at 40 n. 2; *Motta*, Memorandum Opinion and Judgment No. 4227 at 13–14, 2000 WL 727765 at *8.

influenced Rockwell's defense, not the least of which is what Rockwell told his attorney about what happened. As Rockwell concedes, there is "no hint" in the record that he told the police that Fagg was driving to protect the identity of some other driver.

Rockwell argues that the reason there is no evidence to support this alternative defense is that he "was forced to contend with his statements at trial, thus precluding such a defense." This was also apparently Judge Suddock's view; he found that "but for the [wrongly admitted] statements, Rockwell's lawyer could have defended on the basis that Rockwell ... lied to protect the actual driver by blaming Josh Fagg (who was in South America at the time of the incident)."

We have no doubt that Rockwell's credibility was seriously undermined by the many inconsistent statements he made to the police (which are well documented in Judge Suddock's order). But those inconsistencies did not undermine Rockwell's credibility with respect to whether Fagg or someone else was driving. Rather, they undermined the credibility of Rockwell's assertion that *he* was not driving. The evidence that directly challenged Rockwell's claim that *Fagg* was driving was the evidence that Fagg was in Peru at the time. If that evidence (Fagg's testimony, his passport, and other travel documents) did not persuade Rockwell to alter his defense, it is hard to see how suppression of evidence that went to his general credibility would have. We find no basis in the record to conclude that the admission of Rockwell's statements precluded (or even discouraged) Rockwell from arguing that he told the police that Fagg was driving to protect the identity of the real driver.

Because we conclude that Rockwell's defense was not compelled by the superior court's error in admitting his illegally obtained statements, we have no reason to decide whether we would apply a different analysis, or reach a different conclusion on the question of prejudice, if Rockwell had convinced us that his defense was so tainted.

*Harmless Error Analysis*

■ Because Judge Suddock made factual findings on remand, the only issue before us is one of law: whether there is a reasonable possibility that the erroneously admitted statements contributed to the jury's verdicts.[56]

The only disputed issue at Rockwell's trial was whether he was driving; he did not contest that he was intoxicated or that his license was revoked. Judge Suddock found that the State proved with admissible evidence that Rockwell's defense that Fagg was driving was "demonstrably bogus." There was substantial evidence to support this finding. Fagg testified that he traveled to Peru in December 2003 and did not leave until March 2004. (The offenses took place on January 16, 2004.) Fagg's testimony was corroborated by his passport, which was stamped when he entered Peru from Ecuador on December 27, 2003, and again when he departed Peru on March 23, 2004. The court also admitted an immigration card Fagg filled out when he entered Peru on December 27, 2003, and a bus ticket he purchased while there.[57]

Rockwell argues that this evidence was not conclusive because there was no specific evidence that Fagg was out of the country on the night of the offenses. Rockwell observes that there was no stamp in Fagg's passport showing that he reentered the United States, and yet he appeared in person at Rockwell's trial. But as Fagg testified, the United States does not stamp the passports of its citizens. And if Fagg left Peru and returned to the United States before the January incident, as Rockwell suggests, his passport would show that he reentered Peru sometime between January and his final departure from Peru on March 23, 2004. Rockwell has thus not established that Judge Suddock clearly erred in his finding.

Moreover, there was other admissible evidence to undermine Rockwell's claim that Fagg was driving. Officer Patton testified that she saw Rockwell get out of the driver's side of the vehicle, and that Rockwell admit-

**56.** *See, e.g., State v. Shewfelt,* 948 P.2d 470, 471 (Alaska 1997); *Motta,* 911 P.2d at 39–41.

**57.** *Rockwell,* 176 P.3d at 23.

ted to having done this. Rockwell also initially admitted to Patton that he had been driving, though he quickly changed his account and said that Fagg had been driving. Furthermore, Officer Busby testified that he retrieved the keys to the car from Rockwell's back pocket, and that the car was registered to Rockwell.

The jury also heard the grand jury testimony of the driver of the other car, who testified that he observed two people—Rockwell and a man in a dark suit—get out of the driver's side of the vehicle, and that the other man ran from the scene. (Officer Patton partially contradicted this testimony at trial, testifying that the driver of the other car told her at the scene that Rockwell was driving and that the other man fled from the passenger side of the car.[58]) But given how the case was litigated—that is, given Rockwell's defense that Fagg was driving, and the State's evidence that Fagg was in Peru—there is no reasonable possibility that the jury would have acquitted Rockwell based on this grand jury testimony, even if the court had properly excluded Rockwell's illegally obtained statements. We therefore conclude that the superior court's error in admitting Rockwell's statements was harmless beyond a reasonable doubt.

### Conclusion

For the foregoing reasons, we REVERSE the decision of the superior court and AFFIRM Rockwell's conviction.